IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CHARLES FALLER, III, et al. | : |  |
|  | : |  |
| v. | : | Civil Action No. DKC 09-0889 |
|  | : |  |
| CHARLES FALLER, JR., et al. | : |  |
|  | : |  |

**MEMORANDUM OPINION**

This memorandum opinion and its accompanying order will address outstanding motions concerning rulings of United States Magistrate Judge William Connelly on non-dispositive matters. (Papers 101, 102, 117, 121, 122, and 123). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.

I. **Standard of Review**

Under 28 U.S.C. § 636(b)(1)(A), non-dispositive pretrial matters may be referred to a magistrate judge for hearing and determination. A district judge may modify or set aside any portion of a magistrate judge's non-dispositive ruling "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *Id.; see also* Fed.R.Civ.P. 72(a). Under the clearly erroneous standard, the reviewing court is not to ask whether the finding is the best or only conclusion permissible based on the evidence, nor is it to substitute its own conclusions for that of the magistrate judge.

*See Tri-Star Airlines, Inc. v. Willis Careen Corp.*, 75 F.Supp.2d 835, 839 (W.D.Tenn. 1999). Rather, the court is only required to determine whether the magistrate judge's findings are reasonable and supported by the evidence. *Id.* "It is not the function of objections to discovery rulings to allow wholesale relitigation of issues resolved by the magistrate judge." *Buchanan v. Consol. Stores Corp.*, 206 F.R.D. 123, 124 (D.Md. 2002).

## II. Motion to Set Aside Magistrate Judge's Opinion (Paper 101)

In August 2009, Plaintiffs filed, in accordance with Local Rule 104.7, several discovery-related documents, including a motion to compel and Defendants' opposition thereto. (Paper 55). The parties then filed supplemental materials on the matter. (Papers 70, 78, 81). In their motion to compel, Plaintiffs asked Defendants to produce the following:

> 1) all relevant communications involving the law firm of Buchanan, Ingersoll & Rooney PC that are not covered by the attorney-client privilege, including all communications with Buchanan Ingersoll that pre-date this litigation (because such communications are not privileged as a matter of law);
>
> 2) a privilege log describing all relevant communications involving Buchanan Ingersoll which post-date this litigation and which, according to defendants, are subject to the attorney-client privilege or work-product immunity; and
>
> 3) all relevant legal bills from Buchanan Ingersoll and the law firm of Winthrop Shaw

Pittman LLP (because legal bills too are not
privileged as a matter of law).

(Paper 55, Attach. 1, at 1). Plaintiffs argued that no
privilege applied with respect to the post-dispute
communications because Buchanan Ingersoll also represented
Plaintiffs. In opposing the motion to compel, Defendants argued
that they were not required to provide these communications
because Buchanan Ingersoll never represented CSF III, thus he
could not waive the attorney-client privilege on behalf of CSF
Jr. or any of the businesses in which the father and son were
involved. (Paper 55, Attach. 25).

Judge Connelly found that there were five issues for
resolution in Plaintiffs' motion to compel.[1] He granted the
motion in part, denied in part, and found the remainder moot.
(Paper 96). In their motion to set aside aspects of Judge
Connelly's opinion, Plaintiffs object to one element of the
decision, namely, Judge Connelly's finding that Buchanan
Ingersoll had not represented Plaintiffs individually, thus

---

[1] The five issues identified by Judge Connelly were: (a) the
date upon which the dispute arose between CSF III and CSF Jr.;
(b) whether the firm Buchanan Ingersoll ever represented
Plaintiffs and, if so, whether Plaintiffs were entitled to
"post-litigation" communications between Defendants and Buchanan
Ingersoll; (c) whether CSF III was entitled to bills reflecting
Buchanan Ingersoll's fees borne by the various Faller business
entities; (d) the sufficiency of Defendants' privilege logs; and
(e) whether by voluntarily disclosing to CSF III the July 31,
2009, memorandum from Buchanan Ingersoll to Defendant CSF Jr.,
CSF Jr. waived the attorney-client privilege. (Paper 96, at 2).

Defendants were not required to produce a privilege log of communications that post-dated the commencement of the instant suit. (Paper 101, at 2-3). In moving to set aside Judge Connelly's finding on this matter, Plaintiffs advance a number of arguments in support of their contention that Buchanan Ingersoll represented CSF III in his individual capacity. Each of these arguments was presented to Judge Connelly.

In short, Plaintiffs contend that: (1) Buchanan Ingersoll represented CSF III and his wife in estate planning matters; (2) Buchanan Ingersoll represented CSF III in the creation of several trusts in 2005-2006; (3) Buchanan Ingersoll represented CSF III as a trustee for a trust that was created at the same time that Faller Companies was created; and (4) Buchanan Ingersoll represented CSF III as a general partner and member of the family businesses. In support of these arguments, Plaintiffs submit, *inter alia*, a declaration by CSF III and a termination letter and emails from Ronald Abramson ("Mr. Abramson"), a partner at Buchanan Ingersoll who dealt with both parties and their family businesses.

Plaintiffs' primary argument is that Buchanan Ingersoll represented them in an individual capacity in estate planning services, specifically, that the firm helped to create a series of trusts for CSF III's children and then began to do estate planning for them. (Paper 101, at 3-4). In support of their

claim that the firm advised them about estate planning matters, Plaintiffs attach an email from Mr. Abramson to CSF III stating:

> Chuck:
>
> Let's try to "get to" estate planning by the end of this month[.]
>
> OK?

(Paper 101, Attach. 6).

Plaintiffs further contend that Judge Connelly relied on evidence that is irrelevant in making his decision. For example, he "found it significant that 'Buchanan Ingersoll never had an engagement letter with CSF III.'" (Paper 101, at 19 (quoting Paper 96, at 9)). Plaintiffs assert that the lack of an engagement letter is evidence of the firm's "casual approach to dealing with its client" and is irrelevant "because 'an attorney-client relationship may be formed without an express agreement between the parties.'" (Paper 101, at 19 (citing *Attorney Grievance Commission v. Brooke*, 374 Md. 155, 174 (2003)). Plaintiffs also argue that a termination letter sent by Mr. Abramson is proof that a relationship did exist.

Finally, Plaintiffs criticize the fact that Judge Connelly found it relevant that no evidence was presented demonstrating who paid the legal services provided by Buchanan Ingersoll in creating trusts established in 2005 and 2006 on behalf of CSF III's children. Plaintiffs contend that it was error to rely on

the lack of payment in finding that no attorney-client relationship existed. (*Id.*).

Defendants maintain that Judge Connelly adequately addressed the arguments advanced by Plaintiffs and that all of the firm's work was done in the context of representing the Faller family's entities, including Faller Companies, Faller Family, and FFTM I.

Judge Connelly addressed each of the issues raised by Plaintiffs in his memorandum opinion. He cited arguments by each party and highlighted evidence provided by Plaintiffs, including the letter of termination from Mr. Abramson to CSF III. He also laid out the important aspects of Mr. Abramson's deposition and CSF III's declaration, and explained how allegations in the amended complaint filed by Plaintiffs supported Mr. Abramson's testimony. Judge Connelly found that no estate planning was conducted by Buchanan Ingersoll on behalf of CSF III and his wife, Cindy Faller, and that the trusts were created in connection with a new Faller family entity, Faller Companies. He also acknowledged that Buchanan Ingersoll represented CSF III as a trustee for the trust established in connection with Faller Companies.

The matters raised by Plaintiffs were clearly and sufficiently addressed by Judge Connelly and Plaintiffs have not shown that Judge Connelly's determination is clearly erroneous.

He reviewed all relevant evidence and did not rely upon any one particular aspect as dispositive. Rather, he weighed the entirety of the evidence put forward by Plaintiffs and Defendants to reach his determination.

Although the Buchanan Ingersoll attorneys proposed the commencement of estate planning for Plaintiffs, this work had not yet begun at the time the dispute arose that culminated in this litigation. The email cited by Plaintiffs, dated February 17, 2009, indicates that Mr. Abramson and CSF III should try to "get to," or begin, estate planning by the end of the month. On the same date, another attorney sent an email inquiring as to whether CSF III was "ready to proceed with [his] estate plans." (Paper 55, Attach. 8). The dispute underlying this litigation arose on March 3, 2009, approximately two weeks after the emails sent by the Buchanan Ingersoll attorneys. The purpose of the termination letter sent by Mr. Abramson, moreover, was to clarify the position of the firm with regard to CSF III, not to terminate a relationship that existed between CSF III, in his individual capacity, and Buchanan Ingersoll. At his deposition, Mr. Abramson testified that he sent the letter because he "wanted to clarify, now that there was a dispute, that – [it] wouldn't be appropriate for [him] to keep . . . requesting that [CSF III] do [estate planning] for his benefit." (Paper 84, Abramson Dep., at 105). While Mr. Abramson "encouraged" CSF III

to retain the firm for estate planning purposes, CSF III "never hired" the firm for that purpose.  (*Id*. at 106).

**III. Motion to Set Aside Magistrate Judge's Opinion (Paper 102)**

On December 29, 2002, Plaintiffs filed a second motion to set aside a portion of an opinion issued by Judge Connelly. (Paper 102).  In this motion, they ask the court to reverse Judge Connelly's opinion insofar "as it erroneously asserts that the only issues relevant to this case are whether the literal language of an agreement requires a distribution or permits a redemption." (Paper 102, at 3).

The opinion to which they object (paper 97) was filed in response to a motion for a protective order filed by Defendants on August 22, 2009 (paper 56).  Judge Connelly agreed with Defendants that the litigation was limited to two issues, and that the partnership at the heart of the dispute was FFTM I, a company co-owned by Plaintiffs and Defendants.  (Paper 97, at 4).  He also found that the relevant time period for discovery purposes was from August 8, 2007, to March 3, 2009.

Judge Connelly cited the "two issues," in the same language used by Defendants, as

> whether majority general partners [CSF Jr. and his wife] were entitled under a partnership agreement to direct the distribution, or not, of partnership assets, and whether [CSF III], not agreeing with the chosen approach, was entitled to then

> unilaterally declare a redemption of a 5%
> interest he held in the partnership.

(*Id.*).

In moving to set aside this finding, Plaintiffs list a number of other issues they believe are involved. These additional issues, however, are secondary to the two issues identified by Judge Connelly. For example, Plaintiffs contend there is an outstanding issue as to "whether defendants made a separate, enforceable agreement under which CSF III would receive payment for his five percent 'profits interest' at the end of 2008." (Paper 102, at 2). A determination as to whether a separate agreement existed would go to proving or disproving the second issue set forth by Judge Connelly, *i.e.*, whether CSF III was entitled to declare a five percent redemption. While the two issues articulated by Defendants and Judge Connelly are the ultimate issues of the case, there are certainly sub-issues that may have bearing on their outcome.

Judge Connelly's opinion and findings were not contrary to law or clearly erroneous. Accordingly, Plaintiffs' motion to set aside a portion of his memorandum opinion will be denied.

## IV. Motion to Set Aside Order (Paper 117)

On November 11, 2009, Defendants filed a motion in limine to exclude Plaintiffs' proffered expert testimony from consideration in this action. (Paper 87). After Plaintiffs

responded and Defendants replied, Judge Connelly issued a memorandum opinion and order denying Defendants' motion. (Paper 110). On February 5, 2010, Defendants filed a motion to set aside Judge Connelly's opinion, asking this court to reverse and exclude the proffered expert testimony. (Paper 117).

Defendants seek to exclude a report created by (and other testimony of) Raymond Peroutka, Jr. ("Mr. Peroutka"), a certified public accountant. (Paper 90, Ex. V, Peroutka report). In their reply papers, Defendants qualify their request regarding Mr. Peroutka, noting that they have "no objection to [him] testifying as an accountant to the various assets that FFTM I had at a relevant time period, provided he does not opine as to any obligation under the Partnership Agreement, including what the term 'investment' means under the Partnership Agreement." (Paper 131, at 5).

Mr. Peroutka opines in his report that the "General Partners of FFTM I were obligated to disburse at least $72,688,547 to all the partners [by] no later than December 2008 and of that amount $3,997,870 [was to be distributed] to CSF III." (Paper 90, Ex. V, at ¶ 18). He bases this opinion on his review of the records of FFTM I, including the general ledger and working trial balance report of the partnership. He conducts a step-by-step analysis of these records and purports to demonstrate how the funds in FFTM I have been spent and

brought in. He additionally offers an opinion regarding what would qualify as an "investment" under the terms of the partnership agreement. (*Id*. at ¶ 24).

Defendants argued in their motion to exclude that the testimony offered by Mr. Peroutka was

> precisely the sort of testimony that courts have ruled is out of bounds. . . . Mr. Peroutka . . . does not use "scientific, technical, or other specialized knowledge" to assist the trier of fact to understand the evidence or determine a fact in issue in this case. Rather, Mr. Peroutka reviews provisions of the FFTM I Partnership Agreement that have common meanings, provides his opinion regarding what those provisions require, and provides his conclusion that the General Partners of FFTM I have breached those provisions by failing to make the distributions that he says were required.

(Paper 87, at 1-2). They further asserted that the testimony did not fit within the definition of allowed expert testimony pursuant to Federal Rule of Evidence 702, and that the report should be disallowed because it is inconsistent with Plaintiffs' testimony.

Judge Connelly disagreed. First, he analyzed and compared CSF III's deposition and answers to interrogatories with the opinions expressed by Mr. Peroutka. (Paper 110, at 3-6). He found that there was no express inconsistency between Mr. Peroutka's testimony and CSF III's deposition testimony and interrogatory answers. Judge Connelly then addressed the issue

11

of whether Mr. Peroutka impermissibly offered an opinion regarding the contract in dispute. (Paper 110, at 10). He ultimately found that Mr. Peroutka's testimony did not simply interpret FFTM I's partnership agreement. (*Id.* at 11). Judge Connelly ultimately determined that the proffered testimony was admissible, finding it analogous to evidence considered in a case decided by the United States Court of Appeals for the Second Circuit. In that case, the court explained:

> The testimony was offered as part of a longer exposition on Dian Cifuni's violation of established accounting principles. Expert Cohen went through and explained in some detail the payroll checks and bank account statements, providing factual explanations for those procedures that were being followed at C & C Security. Then he offered his opinion based on those procedures as to whether Fiataruolo was responsible under § 6672. Cohen's testimony gave the jury helpful information beyond a simple statement on how its verdict should read.

(Paper 110, at 11-2 (citing *Fiataruolo v. United States*, 8 F.3d 930, 942 (2nd Cir. 1993)).

In their current motion, Defendants argue that Judge Connelly erred by basing his decision on the Second Circuit opinion, which they characterize as "inapposite." (Paper 117, at 1). They reiterate their belief that "any reasonable reading of the expert testimony and of CSF III's testimony would find them inconsistent and irreconcilable," and that Judge Connelly

12

erred in finding that the two sets of testimony were consistent. (*Id.*).

According to Defendants, the expert witness in *Fiataruolo*, who was also a certified public accountant, based his "expert testimony" on facts in the form of observations: reviewing accounting practices at a company, including bank statements and canceled checks, and observing the roles of various people at the firm under investigation. Based upon these observations, Defendants say, the witness "drew conclusions that described how he saw the situation." (Paper 117, at 5). Defendants contend that Mr. Peroutka, by contrast, has conducted a fact-based review of the FFTM I accounts that "has absolutely no bearing on his opinion that the language of Article VIII A required the General Partners to make a distribution at the end of 2008." (*Id.* at 6). They claim that he has impermissibly offered "expert testimony based on the review of a contract in form of a pronouncement on the meaning of the document." (*Id.* at 7).

Judge Connelly's opinion was not clearly erroneous on the facts and properly found that Mr. Peroutka's testimony is admissible. Judge Connelly more than adequately compared comments made by Mr. Peroutka with testimony by CSF III to look for clear conflicts. He then explained that the sections highlighted by Defendants did not adequately express all that

CSF III and Mr. Peroutka discussed, and that they often were not discussing the same topic. For instance,

> [T]he focus of the colloquy quoted above between Defendants' counsel and CSF III is what provision of FFTM I's Partnership Agreement authorized a *distribution to partners to pay taxes*. Mr. Peroutka does not provide an opinion on this topic.

(Paper 110, at 7 (emphasis in original)). Judge Connelly also discussed the fact that CSF III's testimony is somewhat confused:

> [A]lthough CSF III asserts [that] his authority to withdraw $3.9 million is based on an oral agreement with CSF Jr., during his deposition CSF III notes Section VIII.A requires a distribution of funds.

(Paper 110, at 7-8). Defendants' argument that Judge Connelly overlooked conflicts between evidence offered by Mr. Peroutka and CSF III is unpersuasive.

As noted above, Defendants also express their belief that because Mr. Peroutka opined on the "threshold *legal* issue in this case," his opinion is inadmissible. (Paper 117, at 6 (emphasis in original)).[2] Opinions by experts are admissible

_____

[2] In his testimony, Mr. Peroutka notes that the agreement requires that a distribution be made if the available funds were not invested. The critical point he makes is that he does not believe that putting the money in treasury bonds would count as having the money "invested" for purposes of the partnership agreement. Only because of this lack of suitable investment was a distribution required. Thus, the most important interpretation provided by Mr. Peroutka relates to what kind of

insofar as they meet the requirements of Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In his report, Mr. Peroutka uses his expertise in accounting and drafting to analyze the general ledger and bank accounts of FFTM I, and to review the transactions from the sale of the Clarksburg Property. He offers his opinions about different transactions, including a transaction that involved a $506,000 advance to Faller Companies that was initially recorded as a loan, which he characterizes as inconsistent with the requirements of the FFTM I partnership agreement. (Paper 90, Ex. V, at ¶ 24). Although the ultimate issues in this case may seem clear-cut, interpretation of the general ledger and understanding of business practices of the partnership itself

_____

investment is suitable for FFTM I. In their reply, Defendants also object to this line of testimony by Mr. Peroutka. (Paper 131, at 2, footnote 1).

will have bearing.  Allowing an expert witness such as Mr. Peroutka to explain and provide insight regarding these bank accounts and ledgers may be helpful to a trier of fact in determining what funds were available, if any, for distribution at the end of 2008.

The Federal Rules of Evidence permit the trial court to admit expert testimony when it believes that testimony will assist the trier of fact in understanding the case.  *See* Fed.R.Evid. 702.  Experts may testify on questions of fact, as well as mixed questions of fact and law.  *See Fiataruolo*, 8 F.3d at 941.  Mr. Peroutka's testimony is not objectionable merely "because it embraces an ultimate issue to be decided by the trier of fact."  Fed.R.Evid. 704(a).

Judge Connelly's citation to the Second Circuit opinion was appropriate given the lack of a clearly analogous case in this circuit.  In *Fiataruolo*, 8 F.3d at 942, the court found that the trial court's allowance of expert testimony was proper for many reasons, including that the expert provided helpful information "beyond a simple statement on how its verdict should read," and that the expert based his opinion specifically on the work he did and evidence he viewed.  Here, the expert witness similarly offers an explanation of the books and ledgers, and offers his opinion as to why a distribution was necessary and why the funds were not actually "invested."  He also limits his opinion by

noting that "discovery in this case is incomplete" and, therefore, he is not yet fully informed. (Paper 90, Ex. V, at ¶ 19). Mr. Peroutka's testimony is lucid and would be helpful to a trier of fact. Judge Connelly's decision not to prohibit its use in this proceeding was not clearly erroneous.

## V.    Objection and Motion to Set Aside (Papers 121, 122)

On January 29, 2010, Judge Connelly issued a memorandum opinion and order addressing Plaintiffs' motion to compel Defendants to produce the concealed appraisal of the Santa Barbara II Property. (Paper 114). On February 16, Plaintiffs filed a "conditional cross-objection" to the opinion and order. (Paper 121). Defendants filed several distinct motions related to the opinion on the same date. (Paper 122).[3] After a summary of Judge Connelly's opinion, each motion is examined, in turn.

### A.    Judge Connelly's Opinion (Paper 114)

Plaintiffs' motion to compel concerned an appraisal of "the Santa Barbara II Property," which was owned by Faller Companies

---

[3] Defendants also filed a motion to stay the order by Judge Connelly to produce a privilege appraisal, pending resolution of Paper 122 and their objections. (Paper 123). That motion will be denied as it is now moot.

and/or FFTM I. (Paper 114, at 9).[4] Plaintiffs' original document request included "Request No. 8," which sought "[a]ll documents concerning FFTM I's current assets." (Paper 114, at 1). On September 17, 2009, Plaintiffs wrote to Defendants requesting that they provide a copy of a second appraisal of the property pursuant to Request No. 8. (*Id*. at 6-7). Defendants replied that the Santa Barbara II Property was not a "current asset" of FFTM I and that the appraisal sought by Plaintiffs was protected from discovery because it was produced by a consulting expert and prepared in connection with settlement efforts. (*Id*. at 7). Plaintiffs then filed their motion to compel.

Before ruling on the motion, Judge Connelly requested an *in camera* review of the appraisal. His paperless order directed

> Defendants to produce to the Court, for an in camera review, (1) the "other appraisal" of Santa Barbara II, (2) the "engagement letter" retaining the consulting expert who prepared "the other appraisal" of Santa Barbara II, (3) if no engagement letter, then identify the consulting expert, and the date initial contact was made with the consulting expert, and (4) disclose any relationship between the consulting expert (appraiser) and any person designated by Defendants as an expert witness in this case. Defendants must produce the requested

---

[4] Judge Connelly cites conflicting testimony of CSF Jr. and Defendants' expert as to whether FFTM I or Faller Companies owned the Santa Barbara II Property. It seems that FFTM I loaned funds to Faller Companies to enable it to purchase both Santa Barbara II and another property, the Sunset Apartments.

documents and information not later than
Friday, January 22, 2010 at 1:00 p.m.

(Paper 103). Plaintiffs filed a letter requesting that they be allowed to review the materials as well. (Paper 106). Defendants opposed Plaintiffs' request to review the materials, but agreed to provide them for the court. They also noted that the materials were created for the "then upcoming mediation" session scheduled for July 13-14, 2009. (Paper 108).

After reviewing the papers and materials provided by Defendants, Judge Connelly granted Plaintiffs' motion to compel. (Paper 114). He analyzed the relevant issues in five clear steps. First, he noted that he had found Request No. 8 to be relevant on December 22, 2009, and so Defendants had an obligation to produce documents responsive to that request. (Paper 114, at 9). Second, he determined that the Santa Barbara II Property was, as of April 27, 2009, a "current asset" of FFTM I. He based this finding on Defendants' expert report and CSF Jr.'s deposition and characterization of the property as an acquisition made by FFTM I. (*Id*. at 9). Third, Judge Connelly analyzed whether the concealed appraisal was prepared by a consulting expert. (*Id*. at 10). Based on his *in camera* review of the documents, he found that "'counsel for Defendants engaged a consulting expert to provide business valuation consulting services. . . [.] That consultant in turn engaged a real estate

appraiser based in Florida to perform an appraisal of the parcel known as the Santa Barbara II property. . . .'" (*Id*. at 11 (quoting Paper 108)). Finally, he analyzed whether the appraisal was shielded from disclosure where it was obtained by a consulting expert solely for purposes of mediation.

After reviewing the arguments of the parties, Judge Connelly determined that the appraisal was not shielded and must be turned over to Plaintiffs. (*Id*. at 11-14). He cited the fact that Defendants had already turned over an appraisal of Sunset Apartments to Plaintiffs, even though it was also produced for purposes of the mediation, as a persuasive reason to compel Defendants' production of the appraisal letter for the Santa Barbara II Property. (*Id*. at 13). He wrote that

> Defendants presumably could have and should have refused to produce the Sunset Apartments appraisal since it is material related to the July 2009 mediation. Defendants fail to provide an explanation for why "what is good for the goose", *i.e.*, the Sunset Apartments appraisal[,] is *not* "good for the gander", *i.e.*, the "other" Santa Barbara II appraisal. Defendants *voluntarily* breached the terms of the mediation agreement. This shield prohibiting disclosure has been broken.

(*Id*. at 14 (emphasis in original)). He further noted that Defendants also produced another appraisal on the Santa Barbara II Property, "the Armavalage appraisal," but that they argued that it was produced solely in relation to a prospective

transaction and not as a discovery-related disclosure.  Still,

he found that

> [i]f the Armavalage appraisal was disclosed
> because of a prospective transaction and
> further to allow CSF III to consider his
> father's proposal of having Faller Companies
> sell Santa Barbara II to Faller Family, the
> "other appraisal" should have been disclosed
> as well.

(*Id.*).  For these reasons, Judge Connelly granted Plaintiffs'

motion to compel.

**B.   Plaintiffs' Objection**

Despite an outcome in their favor, Plaintiffs now object to

the fact that Judge Connelly reviewed the appraisal *in camera*

(or, *ex parte*, as they characterize it), and further object to

the finding that a consulting expert had commissioned the

appraisal.   (Paper 121, at 1-2).   Judge Connelly had the

discretion to determine whether to conduct an *in camera* review

of the documents prior to making his ruling.   The Fourth Circuit

has held that

> [e]videntiary privileges may serve as valid
> bases to block the disclosure of certain
> types of evidence, and the validity of such
> privileges may be tested by in camera and ex
> parte proceedings before the court "for the
> limited purpose of determining whether the
> asserted privilege is genuinely applicable."

*United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008)

(quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1060 (D.C. Cir.

1986)).  Plaintiffs' objection will be overruled, as Judge Connelly's decision was not contrary to law.

## C. Defendants' Motion

Although Judge Connelly's decision regarding the *in camera* submission is not clearly erroneous or contrary to law, the question remains as to whether he properly granted Plaintiffs' motion to compel.[5]  Resolution of this issue turns primarily on three arguments advanced by Defendants and rebutted by Plaintiffs: (1) whether the appraisal is relevant; (2) whether it is privileged because it was prepared by a non-testifying expert witness; and (3) whether it is privileged because it was prepared in connection with mediation.  Plaintiffs assert that if the concealed appraisal was privileged, the privilege was waived, as Judge Connelly found.  Plaintiffs further contend that exceptional circumstances exist that warrant production of the appraisal.  Each of these issues is contested by the parties, and will be analyzed below.

### 1. Relevance

Defendants argue that Judge Connelly incorrectly found that the valuation of the Santa Barbara II Property is relevant to

---

[5] In a motion filed February 16, 2010, Defendants ask the court to reverse Judge Connelly's opinion and deny Plaintiffs' motion to compel.  (Paper 122).  Plaintiffs have filed papers in opposition (paper 129) and Defendants have filed a reply (paper 136).

the instant case. (Paper 122, at 5-6). They assert that the concealed appraisal is not relevant in any way to the two issues identified in another ruling by Judge Connelly as central to the case,[6] and that the Santa Barbara II Property has at "no time been an asset of FFTM I." (*Id*. at 5).[7] According to Defendants, the property was acquired by FFT Santa Barbara II, LLC, which is wholly owned by Faller Companies. FFTM I loaned Faller Companies $1.4 million, which, in turn, was loaned to FFT Santa Barbara II, LLC, to purchase the property. Faller Companies' interest in FFT Santa Barbara II, LLC, was transferred in August 2009 to another company, Faller Family, LLC. Faller Companies then repaid the $1.4 million to FFTM I. Defendants add that the loan from FFTM I was unsecured. Finally, Defendants argue that the sale of the Santa Barbara II Property is a matter that is

---

[6] Judge Connelly has previously held that the two issues in this case are:
> [1] whether majority general partners [CSF Jr. and his wife] were entitled under a partnership agreement to direct the distribution, or not, of partnership assets, and [2] whether [CSF III], not agreeing with the chosen approach, was entitled to then unilaterally declare a redemption of a 5% interest he held in the partnership.

(Paper 97).

[7] There is no dispute that FFTM I is the business at the heart of this case. Defendants argue that the Santa Barbara II Property has nothing to do with FFTM I, but concerns only other Faller family businesses.

23

the subject of an arbitration proceeding pending in Florida; thus, the related issue should not be decided in this action. Defendants contend that Plaintiffs may not use this proceeding to obtain discovery on disputes subject to binding arbitration.

Plaintiffs counter all of Defendants' arguments. (Paper 129, at 13-17). They first argue that the appraisal goes directly to CSF Jr.'s credibility, which, they observe, is always relevant.[8] They contend it would "almost certainly confirm that CSF Jr. violated his statutory and contractual duties of good faith and fair dealing" by draining FFTM I of its assets (*id*. at 2-3), including any profit in the Santa Barbara II Property, and by attempting to mislead CSF III into concluding that the property was worth less than CSF Jr. knew its value to be. They further assert that the Santa Barbara II Property was an asset of FFTM I, as Judge Connelly determined.

Regarding the arbitration proceeding, Plaintiffs maintain that Defendants have waived their argument by failing to object to Judge Connelly's prior ruling that it is "irrelevant" to this

---

[8] Plaintiffs believe that the concealed appraisal will reveal that the Santa Barbara II Property was worth more than $4 million when it was sold, which would be contrary to CSF Jr.'s testimony that it was sold for its full appraised value of $4 million.

"outstanding discovery motion." (Paper 113).[9] Plaintiffs argue
that under Fed.R.Evid. 404(b) evidence of other wrongs or acts
may be admissible, and that the rule encompasses the allegations
concerning CSF Jr.'s plan to drain FFTM I of its assets.
Finally, Plaintiffs assert they are not attempting to replicate
the arbitration proceedings in court; rather, they seek the
appraisal to show bad faith by CSF Jr. in stripping FFTM I of
its assets, a claim distinct from that presented at arbitration.

Judge Connelly's finding that the concealed appraisal is
relevant was not clearly erroneous or contrary to law, and will
be upheld. FFTM I, a partnership started in 1994 by CSF Jr. and
CSF III, is the business at the heart of the dispute in this
matter. FFTM I purchased and held property in Clarksburg,
Maryland, that was developed by the parties and later sold for

---

[9] Judge Connelly issued a paperless order on January 28,
2010, at Paper 113:

> PAPERLESS ORDER DENYING 107 Defendants'
> Motion for Leave to File Arbitration
> Answering Statement and Counterclaim as
> Supplemental Material. The undersigned
> finds as irrelevant the Arbitration
> Answering Statement and the Counterclaim to
> the outstanding discovery motion,
> Plaintiffs' Motion to Compel Defendants to
> Produce the Other Appraisal of the Santa
> Barbara II Property (Document No. 91). Judge
> Chasanow will decide whether the Arbitration
> Answering Statement and the Counterclaim are
> relevant to the outstanding motions,
> Document Nos. 64 and 69.

$79,431,365.00. The partnership agreement of FFTM I is also central to the controversy in this case. The meaning of several sections of that agreement is in dispute, as are the actions of the parties relative thereto. Although the two issues articulated by Judge Connelly in this case are well-defined, the facts that may assist in proving or disproving either party's case are somewhat unwieldy. Any information relating to the bank accounts and value of FFTM I may be relevant.

Seeking all relevant evidence relating to FFTM I, Plaintiffs filed Request No. 8 for production of "[a]ll documents concerning FFTM I's current assets," and that request was found proper by Judge Connelly. When Defendants objected that the request was overly broad, Plaintiffs enumerated the documents they sought, "including documents concerning the value of income-producing assets (the Sunset Apartments and FFT Santa Barbara), such as sales contracts, appraisals, and tax assessments." (Paper 91, Attach. 9).

There is nothing in the record suggesting that Defendants objected to the scope of this request after Plaintiffs listed the documents they sought. In addition, at least one appraisal of the Santa Barbara II Property, the Armavalage appraisal, was given to Plaintiffs by Defendants. Defendants claim that they produced the Armavalage appraisal only so CSF III could evaluate CSF Jr.'s request to sell the property. In order for CSF III to

make an informed judgment, however, he would appear to need all the information related to the proposed sale. *See Herring v. Offutt,* 266 Md. 593, 597 (1972) ("The partnership relationship is of a fiduciary character which carries with it the requirement of utmost good faith and loyalty and the obligation of each member of the partnership to make full disclosure of all known information that is significant and material to the affairs or property of the partnership.") (citing *Allen v. Steinberg*, 244 Md. 119, 128 (1965)). Defendants also turned over an appraisal for the Sunset Apartments, which appears to have a similar relationship to FFTM I as the Santa Barbara II Property. It is unclear why the Armvalage and Sunset Apartments appraisals are relevant but the concealed appraisal is not.

The Santa Barbara II Property clearly had implications for FFTM I because FFTM I loaned money to Faller Companies to purchase it. The experts for both parties reference the Santa Barbara II Property when referring to FFTM I, as Judge Connelly noted. CSF Jr. testified that both the Santa Barbara II Property and Sunset Apartments were "two of the acquisitions made by FFTM I." (Paper 91, Attach 33, at ¶ 4). Defendants' expert observed that FFTM I invested in Santa Barbara II and expected a return on that investment. (Paper 114, at 14). Even if it was only an indirect investment, the Santa Barbara II

Property did have bearing on the accounts of FFTM I and, as such, its actual value is relevant to this case.

Finally, Defendants' argument that the appraisal is not relevant because of an ongoing arbitration hearing that concerns the sale of the property is without merit. The arbitration demand was not filed until after Plaintiffs filed their motion to compel. Also, there is no danger of litigating the same issue in this case because the two proceedings are addressing discrete issues, even though the parties are the same. In the arbitration proceeding, the demand filed by CSF Jr. seeks to arbitrate CSF III's challenge to the August sale of the Santa Barbara II Property. The sale of the Santa Barbara II Property is not directly at issue in this case, and whether it was done pursuant to the agreement of the parties involved will be determined through arbitration. The result of arbitration, however, could potentially have bearing on the motives and credibility of the parties in this case.[10]

_____

[10] Although Plaintiffs assert that Fed.R.Evid. 404(b) allows evidence of other acts to come in, they have not clearly articulated the facts to satisfy the test set by the Fourth Circuit:

> [W]e hold that evidence of prior acts becomes admissible under Rules 404(b) and 403 if it meets the following criteria: (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general

Judge Connelly's decision that this appraisal is relevant and, thus, discoverable, was not contrary to law and the court will not set aside that aspect of the decision.

**2.    Privilege Arguments**

**a.    Consulting Expert Privilege**

Defendants next challenge Judge Connelly's decision that by disclosing both the Armavalage appraisal and the Sunset Apartments appraisal, they waived their non-testifying expert privilege.  (Paper 122, at 8).  Judge Connelly found that Defendants voluntarily provided the appraisal of Sunset Apartments to Plaintiffs, and, although purportedly not for discovery reasons, they also released the Armavalage appraisal to Plaintiff CSF III.  (*Id*.).  Defendants, however, refused to

---

character of the defendant. In this regard,
the more similar the prior act is (in terms
of physical similarity or mental state) to
the act being proved, the more relevant it
becomes. (2) The act must be necessary in
the sense that it is probative of an
essential claim or element of the offense.
(3) The evidence must be reliable. And (4)
The evidence's probative value must not be
substantially outweighed by confusion or
unfair prejudice in the sense that it tends
to subordinate reason to emotion in the
fact-finding process.

*Westfield Ins. Co. v. Harris*, 134 F.3d 608, 614 (4th Cir. 1998)
(quoting *United States v. Queen*, 132 F.3d 991, 999-1000 (4th Cir.
1997)).

produce the concealed appraisal after Plaintiffs discovered its existence.

Defendants argue that Fed.R.Civ.P. 26(b)(4)(B) applies to protect the concealed appraisal. They first contend that Judge Connelly failed to apply the legal standard governing subject matter waiver of work product protection. Secondly, they argue that courts have interpreted Fed.R.Civ.P. 26(b)(4)(B) to mean that "partial disclosure of a non-testifying expert's work product does not waive a party's right to withhold production of the expert's undisclosed work product." (Paper 122, at 10 (citing *Hollinger Int'l Inc. v. Hollinger, Inc.*, 230 F.R.D 508, 522 (N.D.Ill. 2005)). According to Defendants, even if the disclosure of the Sunset Apartments appraisal could constitute subject matter waiver of work product protection, any such waiver would have to be limited to the Sunset Apartments appraisal and would not result in waiver relative to appraisal of a different property by a different appraiser. (*Id*. at 10).

Defendants also argue that because the concealed appraisal is protected by Rule 26(b)(4)(B), "no subject matter waiver can result from disclosure of a *different* document prepared by a *different* expert for an unrelated purpose – even if that document happens to pertain to the same subject matter." (Paper 122, at 12 (emphasis in original)). Therefore, Defendants contend, Judge Connelly's finding that the voluntary disclosure

of the Armalavage appraisal resulted in a waiver of protection for the concealed appraisal is incorrect. They maintain that if Judge Connelly's opinion is correct – *i.e.*, that because one of the appraisals was voluntarily released the other one must be as well – then "parties to litigation would never be able to confidentially test the waters by seeking out expert advice through a non-testifying expert prior to engaging a different expert to testify." (Paper 122, at 12). Finally, Defendants argue that because there has been no waiver, Plaintiffs must meet the "exceptional circumstances" test imposed by Rule 26(b)(4)(B), and the circumstances required to meet such a test are not present in this case.

Plaintiffs argue, first and foremost, that Judge Connelly relied on principles of fairness in making his decision, which the 1970 Advisory Committee noted were relevant in crafting Fed.R.Civ.P. 26(b)(4)(B). They assert that it would be fundamentally unfair to permit one appraisal that supports a claim made by Defendants to be available, but to repress a second, contemporaneous appraisal that refutes the same claim. (Paper 129, at 18-19). Plaintiffs contend that Defendants are attempting to use the privilege as both a shield and a sword. They allege that Defendants relied on the appraisal of Sunset Apartments to attack the assumptions underlying CSF III's

calculation of what his five percent "profits interest" should be. (*Id*. at 20).

Plaintiffs also argue that a subject-matter waiver is applicable because the Sunset Apartments appraisal and the concealed appraisal of the Santa Barbara II Property concern the same subject matter, were obtained for the same purpose (*i.e.*, to assist in mediation), and were obtained from the same consulting expert. Thus, to allow CSF Jr. to disclose one appraisal but not the other would be an "unfair partial disclosure." (*Id*. at 23). Plaintiffs further allege that the non-testifying consultant who obtained the appraisals works at the same firm and is a partner of the testifying expert, Peter McKenna. According to Plaintiffs, by using the same firm as both a consulting expert and a testifying expert, Defendants risked disclosure of the materials to the testifying expert, which renders them discoverable.

Finally, Plaintiffs argue that even if Judge Connelly was clearly erroneous in finding that Defendants had waived any privilege pertaining to the concealed appraisal, they have established that exceptional circumstances warrant disclosure. They argue that although they could commission other appraisals, the concealed appraisal is the only evidence proving that "when CSF Jr. claimed (and indeed testified) that he relied on Santa Barbara II's 'appraised value' to justify the fairness of the

sale, he was in reality acting in bad faith and attempting to mislead CSF III." (*Id.* at 26).

      **b.   Mediation/Settlement Privilege**

Judge Connelly found that Defendants produced the Sunset Apartments appraisal voluntarily, despite the fact that it was prepared for the July 2009 mediation, as was the concealed appraisal. (Paper 114, at 13-14). Therefore, he found, Defendants voluntarily breached the terms of the mediation agreement and the shield prohibiting disclosure was broken. (*Id.*).

Defendants argue that the mediation agreement evidences their intent that any disclosure not waive overall work product protection for all documents created under Fed.R.Civ.P. 26(b)(4)(B). They observe that the transmittal letter providing the Sunset Apartments appraisal to Plaintiffs stated that "[t]he appraisal is provided without prejudice to the Defendants' position that the appraisal is not subject to discovery or admission in evidence." (Paper 122, at 11). Defendants contend that they could not reasonably have expected that work product protection regarding the concealed appraisal was compromised by providing the Sunset Apartments appraisal.

Plaintiffs only cursorily address this issue, noting that a case upon which Defendants rely does not actually support their arguments. (Paper 129, at 21).

### 3. Privilege Analysis

Fed.R.Civ.P. 26(b)(4)(B) provides that

> Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
>
> (i) as provided in Rule 35(b); or
>
> (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

This subsection of the rule addresses a discrete category of evidence, with a different standard, than that addressed by Fed.R.Civ.P. 26(b)(3)(A). In the latter rule, a party who seeks non-discoverable evidence must show that it has substantial need and cannot obtain the substantial equivalent by other means. *See* Fed.R.Civ.P. 26(b)(3)(A)(ii). The rule at issue in this case was created to reject judicial decisions categorizing non-testifying expert opinions as work product doctrine, and to engrain in the rules a form of the doctrine of unfairness.[11]

---

[11] The Advisory Committee noted of this section of the rule that

> These new provisions of subdivision (b)(4) repudiate the few decisions that have held an expert's information privileged simply because of his status as an expert, *e.g.,*

Fourth Circuit cases on this provision are sparse, and most decisions conclude that the rule does not limit discovery of the identity of the expert. *See, e.g., Baki v. B.F. Diamond Const. Co.*, 71 F.R.D. 179 (D.Md. 1976).

Commentators have found, however, that "allowing routine discovery as to [non-testifying experts] would tend to deter thorough preparation of the case and reward those whose adversaries were most enterprising." 8A Wright, Miller & Marcus, Federal Practice and Procedure § 2032, at 94 (3d ed. 2010). Rule 26(b)(4)(B) is "designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation." *Durflinger v. Artiles*, 727 F.2d 888, 891 (10th Cir. 1984). The party "seeking discovery from

---

American Oil Co. v. Pennsylvania Petroleum Products Co., 23 F.R.D. 680, 685-686 (D.R.I. 1959). See *Louisell, Modern California Discovery* 315-316 (1963). They also reject as ill-considered the decisions which have sought to bring expert information within the work-product doctrine. See *United States v. McKay,* 372 F.2d 174, 176-177 (5th Cir. 1967). The provisions adopt a form of the more recently developed doctrine of "unfairness". See *e.g., United States v. 23.76 Acres of Land,* 32 F.R.D. 593, 597 (D.Md. 1963); Louisell, *supra*, at 317-318; 4 *Moore's Federal Practice* 26.24 (2d ed. 1966).

Fed.R.Civ.P. 26, 1970 Advisory Committee Notes.

nontestifying retained experts faces a heavy burden." 8A
Wright, Miller & Marcus, § 2032, at 105.

Given that there is no disagreement that Fed.R.Civ.P.
26(b)(4)(B) applies,[12] the remaining questions are whether a
waiver occurred and, if not, whether "exceptional circumstances"
warrant discovery of the concealed appraisal.

Although Judge Connelly found that a subject matter waiver
occurred because of the production of the Sunset Apartments
appraisal, several courts have found that Rule 26(b)(4)(B) is
distinct from Rule 26(b)(3) and that the work product doctrine
applicable in the latter rule does not apply in a case like
this, which deals solely with non-testifying expert work. In
*Vanguard Savings and Loan Ass'n v. Banks*, Civ. No. A. 93-4627,
1995 WL 71293, at *2 (E.D.Pa. Feb. 17, 1995), for example, the
court noted that "[i]t is . . . clear that Rule 26(b)(4)(B) is
unrelated to the work product privilege." The subject matter of
the concealed appraisal is distinct from the Sunset Apartments

---

[12] Judge Connelly found that a consulting expert was
retained, solely for purposes of mediation, after the mediation
agreement between the parties was executed, and that the
consultant, in turn, engaged a real estate appraiser to perform
the appraisal that he used to value the business. (Paper 114,
at 11). Although Plaintiffs challenge the *in camera* inspection
and the fact that a consulting expert was retained in a separate
objection, this objection will be overruled. They do not argue
in their response that Fed.R.Civ.P. 26(b)(4)(B) does not apply
in this case.

appraisal.   It  concerns  a  different  property  and  there  is
presently  no  disagreement  as  to  its  value.   The  Armavalage
appraisal  is  also  different  because  it  was  non-privileged  and
was  given  to  CSF  III  in  his  capacity  as  part  of  the  company
involved  in  the  transaction,  not  as  a  plaintiff  in  this  case.
If,  by  handing  over  this  appraisal  to  Plaintiff  CSF  III,
Defendants  unwittingly  waived  protection  of  all  other  appraisals
or  all  work  done  by  this  consultant,  it  could  result  in  a
chilling  of  investigation  or  seeking  of  expert  advice,  which  is
precisely  what  the  rule  was  intended  to  avoid.

Judge  Connelly  also  found  that  by  producing  the  Sunset
Apartments  appraisal,  Defendants  waived  any  claim  of
confidentiality  with  respect  to  the  mediation  agreement.   Both
Defendants  and  Plaintiffs  cite  *In  re  Mutual  Funds  Investment
Litigation*,  251  F.R.D.  185  (D.Md.  2008),  in  support  of  their
respective  arguments  on  this  issue.   In  that  case,  former
employees  involved  in  a  class  action  suit  against  fiduciaries  of
an  ERISA  plan  demanded  production  of  documents.   During  a
previous  regulatory  case,  the  defendants  had  produced  to  the
Securities  and  Exchange  Commission  a  number  of  privileged
documents  subject  to  non-waiver  and  confidentiality  agreements
that  included  some,  but  not  all,  of  the  documents  desired  by  the
plaintiffs.   The  plaintiffs  asserted  that  because  some  of  the
papers  had  been  disclosed  the  privilege  was  waived  for  all  of

them. Judge Blake found there was "no question that the defendants have disclosed otherwise protected material, voluntarily, to an adversary, for their own benefit in negotiating a settlement with the regulators." *Id*. at 187. After reviewing relevant case law, the court determined that "[t]he defendants' voluntary disclosure of otherwise protected material to the SEC and NYAG, despite the entry of a confidentiality agreement, results in waiver." *Id*. at 187-188. Judge Blake also found, however, that no subject matter waiver existed based on the disclosures made to the SEC and NYAG; rather, the waiver was "limited to the documents actually disclosed." *Id*. at 188. Ultimately, then, the documents that were previously disclosed to regulators were disclosed to the plaintiffs, but none of the other, similar materials lost their privilege. Analogizing to the instant case is difficult because there was no previous disclosure to another party or in a separate transaction. The relevant issue, however, boils down to how broadly subject matter waiver extends when confronted by a confidentiality agreement.

In this case, there is no reason to extend it past the document that was voluntarily given. Contrary to Plaintiffs' argument, it is unclear that Defendants are using the Sunset Apartments appraisal as a "sword," or to their advantage, at all; rather, they are simply putting a correct value on the

company.  Thus, there is no reason to extend the waiver to another document that covers a different property when a plainly-written confidentiality agreement exists and should be in force.

Although no waiver exists, the inquiry does not end there because Rule 26(b)(4)(B)(ii) still permits discovery in cases of exceptional circumstances.  As the United States District Court for the Northern District of Indiana explained in *Hartford Fire Ins. Co. v. Pure Air on the Lake, Ltd.*, 154 F.R.D. 202, 206-07 (N.D.Ind. 1993):

> The opinions of non-testifying experts are discoverable only on a showing of exceptional circumstances.
>
> Whether an expert's evidence is protected by Rule 26(b)(4) from discovery must be determined in the light of the nature of the documents or testimony sought, and the total factual situation in the particular case. The rule comes into play only if the experts and their information can fairly be said to have been obtained or acquired because of the prospect of litigation. (footnotes omitted).

(citing 2 Shepard's, Discovery Proceedings in Federal Court, § 16.19 (2nd ed. 1991)).

Exceptional circumstances are presented in this case, which is unlike most described by treatises and courts addressing Rule 24(b)(4)(B).  For instance, Wright, Miller & Marcus write that the

> assumption [underlying the rule] is that
> ordinarily each party has a full opportunity
> to retain its own experts; unlike fact
> witnesses they are not unique, and in an era
> when experts' services are widely marketed,
> the supply of potential witnesses is often
> large.

8A Wright, Miller & Marcus, § 2032, at 96.  In this situation,

the problem is not a lack of (or plethora of) expert services at

all.  Furthermore, courts have found that the rule's history

requires it to be interpreted in light of the unfairness

doctrine; thus, courts should be cautious in allowing one party

to poach the expertise and work of the other party, which has

invested financially in developing that work.[13]

---

[13] The court, in *Pearl Brewing Co. v. Joseph Schultz Brewing Co.*, 415 F.Supp. 1122, 1138 (S.D.Tex. 1976), found that:

> The 'unfairness' doctrine now embodied
> in Rule 26(b)(4)(B) had its genesis in two
> district court cases. *Boynton v. R. J.
> Reynolds Tobacco Co.*, 36 F.Supp. 593
> (D.Mass. 1941); *Lewis v. United Air Lines
> Transport Corp.*, 32 F.Supp. 21 (W.D.Pa.
> 1940).  The doctrine established by these
> cases and refined or interpreted by
> subsequent commentary, e.g., 4 J. Moore,
> Federal Practice P26.66(4) at 26-483 (1975);
> Long, Discovery and Experts Under the
> Federal Rules of Civil Procedure, 38 F.R.D.
> 111 (1965) ('Long'), emphasizes that
> financial factors are to be considered
> before one party is permitted access to an
> adversary's expert to 'extract' his
> expertise without having to underwrite the
> initial costs or long-range expense of
> retaining and consulting with that expert.

40

Here, however, Plaintiffs' request is not for production of expert reports or multiple appraisals, and money is seemingly not a factor. Rather, the discovery of one particular appraisal is sought. Retaining additional experts and conducting new appraisals will not remedy the situation for Plaintiffs. Several courts have "recognized the availability of other means of obtaining information sought under Rule 26(b)(4)(B) as a conclusive factor militating against a finding of exceptional circumstances." 33 A.L.R. Fed. 403 § 18(a) (citing cases). Not only is it "impracticable" for Plaintiffs to obtain what they seek through other methods, it is impossible. In this case, there is only one report that matters because the information that Plaintiffs ultimately seek is the effect that the conclusion reached by that report had upon Defendant CSF Jr.'s reasoning in selling a piece of property owned by a company of which he was a fiduciary. Although Judge Connelly's reasoning

---

The basic premise of the doctrine therefore is that permitting discovery of experts is unfair inasmuch as it is the equivalent of taking another's property without proper compensation. *Walsh v. Reynolds Metals Co.*, 15 F.R.D. 376 (D.N.J. 1954). There is the additional danger, beyond any consideration of proper compensation, that such discovery would afford the opportunity to take unwarranted advantage of an adversary's trial preparation. *Smith v. Hobart Mfg. Co.*, 188 F.Supp. 135 (E.D.Pa. 1960); Long, supra, 38 F.R.D. at 132-33.

was not entirely supported by the weight of the evidence, he reached the proper conclusion in granting Plaintiffs' motion to compel and ordering Defendants to produce the concealed appraisal of the Santa Barbara II Property.

As noted, because the court will issue a ruling on Defendants' motion to set aside Judge Connelly's order, Defendants' motion to stay (paper 123) is now moot, and will be denied.

## VI. Conclusion

For the foregoing reasons, Plaintiffs' motions to set aside portions of the orders issued by the magistrate judge will be denied and their objection will be overruled; Defendants' two motions to set aside orders by the magistrate judge will be denied; and Defendants' motion for a stay will be denied as moot. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
